IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD BELL *et al.*,  )
                       )
            Plaintiffs )
                       )  Civil Action No.: 10 C 3263
     v.                )
                       )  Suzanne B. Conlon, Judge
VILLAGE OF STREAMWOOD, *et al.*,  )
                       )
            Defendants. )
                       )
                       )

**<u>MEMORANDUM OPINION AND ORDER</u>**

The fateful encounter between Ronald Bell and James Mandarino (then a corporal with the Village of Streamwood Police Department) was videotaped. Shortly before 4:00 a.m. on March 28, 2010, Mandarino contends he saw a vehicle driven by Ronald Bell commit a traffic violation. The police car's dashboard camera (which does not capture sound) recorded Mandarino following the vehicle as it drove through a neighborhood and pulled into the driveway of the home of Ronald and his brother, Stacey Bell.[1] In the ensuing encounter, Mandarino tasered the passenger twice and struck Ronald fifteen times with his baton. Ronald was arrested and charged with driving while intoxicated, reckless driving, squealing tires, and resisting arrest. The charges were later dropped. Mandarino was terminated from the police department and faced state criminal charges.

---

[1] Because Ronald and Stacey Bell share a last name, the court refers to them by their first names.

1

Ronald and Stacey Bell sue Mandarino and the Village of Streamwood for violations of 42 U.S.C. § 1983 and state law claims.[2] The Bells, Mandarino, and the village each move for partial summary judgment. The Bells respond to only some of Mandarino's summary judgment arguments, abandoning the unanswered claims.[3] Ronald's remaining claims are a § 1983 excessive force claim against Mandarino and a failure to train claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), against the village (Count I); a § 1983 false arrest claim against Mandarino (Count II); a state law assault and battery claim against Mandarino (Count VI); a state law false imprisonment claim against Mandarino (Count VII); a state law malicious prosecution claim against Mandarino (Count VIII); and a state law claim of intentional infliction of emotional distress against Mandarino (Count IX). Stacey's remaining claim against Mandarino is a state law intentional infliction of emotional distress claim (Count IX). Both Bells assert a state law *respondeat superior* claim (Count X) and an indemnification claim (Count XI) against the village. Mandarino moves for summary judgment on Ronald's false arrest, false imprisonment, and malicious prosecution claims and on Stacey's intentional infliction of emotional distress claim. The Bells move for summary judgment on the indemnification claims against the village. The village moves for summary judgment on Ronald's *Monell* claim.

---

[2] Two other plaintiffs, Nolan Stalbaum (the passenger) and Sheila Bell (Stacey Bell's wife), also filed suit. The parties represent these plaintiffs settled their claims. Similarly, several other defendants were sued: Paul Petrick, Matthew McLean, Mary Saczawski, Alex Jozefowski, Randall Hart, and other unknown Streamwood Police Officers. The parties also report these defendants settled. No motions to dismiss have been filed, formally terminating these parties. However, the court assumes they are not at issue in this opinion.

[3] Specifically, the Bells abandon Count II as to Stacey, Count III, Count IV, Count V, Count VI as to Stacey, Count VII as to Stacey, and Count VIII as to Stacey.

2

## I. Standard of Law

Summary judgment is appropriate if the record evidence establishes no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears an initial burden of establishing the absence of a disputed issue for trial. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). The nonmoving party must then go beyond the pleadings and cite evidence disputing the facts that could support a reasonable jury finding in the nonmoving party's favor. *Delapaz v. Richarsdon*, 634 F.3d 895, 900 (7th Cir. 2011). For purposes of each summary judgment motion, the nonmoving party receives the benefit of all reasonable inferences and disputed facts are resolved in the nonmovant's favor. *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). Three summary judgment motions are before the court. Each motion must be analyzed separately so that the appropriate party receives the benefit of reasonable inferences. *Clarendon National Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011).

## II. Defendant James Mandarino's Motion

### A. Ronald Bell's claims of false arrest, false imprisonment, and malicious prosecution

Mandarino argues judgment should be entered for him on the false arrest, false imprisonment, and malicious prosecution claims because the undisputed facts establish he had probable cause to stop and arrest Ronald. The existence of probable cause is fatal to all three claims. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622, 626 (7th Cir. 2010). However, it is unnecessary to set forth the facts behind these claims because Mandarino's motion plainly fails to show the absence of a genuine issue of material fact. His evidentiary basis to show probable cause existed is inadequate.

At issue is a set of plaintiffs' requests to admit under Federal Rule of Civil Procedure 36 served on Mandarino. *See* Def. App'x [112], Ex. 1.[4] Among the requests, plaintiffs asked Mandarino to admit or deny that "Defendant James Mandarino effectuated a lawful traffic stop of Plaintiff Ronald Bell on March 28, 2010," and that "Defendant James Mandarino effectuated a lawful arrest of Plaintiff Ronald Bell on March 28, 2010." *Id.*, Ex. 1 ¶¶ 14–15. Mandarino admitted both. *Id.* Now he seeks to have his lawful arrest of Ronald deemed conclusively established for the litigation, thereby foreclosing the false arrest, false imprisonment, and malicious prosecution claims. In other words, he seeks to use the admissions *he* made in the requests to admit against the *proponent* of the requests. Plaintiffs correctly deny that requests to admit can be used in this manner and dispute the lawfulness of the traffic stop by citing to Ronald Bell's deposition testimony that he did not squeal his tires or commit another traffic violation before being pulled over. Pl. Facts [126] ¶ 3.

Rule 36 allows a party to request that another party admit the truth of facts, the application of law to fact, or opinions about either related to the case. FED. R. CIV. P. 36(a). If the responding party admits a request or fails to respond, the matter is deemed admitted and conclusively established as between those parties for the remainder of the litigation, unless the court allows an admission to be withdrawn or amended. *Id.* 36(b); *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607 (7th Cir. 2008). Mandarino cites cases emphasizing that Rule 36 admissions are binding and cannot be contradicted by other evidence unless the admissions are

---

[4] Because three separate summary judgment motions have been filed, there are three separate statements of undisputed facts and three separate statements of additional facts. For convenience, the court refers to each filing as either plaintiff's facts or defendant's facts and identifies the docket number of each filing in brackets.

4

withdrawn. *See, e.g., Banos v. City of Chicago*, 398 F.3d 889, 892 (7th Cir. 2005); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987); *Perez v. Miami-Dade County*, 297 F.3d 1255, 1268 (11th Cir. 2002); *Myers v. Town of Putney (In re Corp. of Windham College)*, 34 B.R. 408, 411 (D. Vt. 1983). But those cases are inapposite. In each, admissions were used against the responding party, not against the proponent of the request, as Mandarino attempts to do here.

Mandarino has not identified law contradicting the Bells' cited authority that his admissions are not binding on them. In *Champlin v. Oklahoma Furniture Manufacturing Co.*, 324 F.2d 74 (10th Cir. 1963), at issue was whether defendant manufactured the chair from which plaintiff fell and injured herself. Defendant sent plaintiff a Rule 36 request to admit or deny that the chair was manufactured by defendant. *Id.* at 75. Plaintiff admitted the fact, and at plaintiff's request, the trial judge incorporated plaintiff's admission in the pretrial order and precluded either party from contesting that defendant manufactured the chair. *Id.* The Tenth Circuit held that it was error for the court to incorporate plaintiff's admissions into the pretrial order without an agreement from defendant that the fact was undisputed. *Id.* ¶ 76. The court noted that "[t]he submission of requests for admissions by a litigant does not, in and of itself, bind the litigant to the truth or existence of the facts contained in the answers to the requests." *Id.* Although *Champlin* took place before substantial amendments were made to Rule 36 in 1970, current authority supports the continuing validity of its holding. *See* 8B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2264 (3d ed. 2010) ("A party may not utilize its own admissions at the trial"); *id.* ("The admission does not bind the party who requested it"); *see also Brook Vill. N. Assocs. v. Gen. Elec. Co.*, 686 F.2d 66, 69–75 (1st Cir. 1982) (defendant was bound by amount of damages set forth in request to admit

5

it failed to answer and could not argue for a lower amount, but plaintiff was free to introduce evidence that damages were even higher because it was not bound to that amount and only that amount).

In his brief, Mandarino relies solely on the purported Rule 36 admission that Mandarino effectuated a lawful traffic stop, and he contends the traffic offense gave him probable cause to arrest Ronald. The admission, however, is not binding on Ronald and cannot be used to support Mandarino's version of events. Without a binding admission, the court may consider Ronald's testimony that he did not commit a traffic offense before he was pulled over and that afterwards, he followed all of Mandarino's commands and did not resist. Pl. Facts [126] ¶¶ 3, 20–21. Mandarino disputes this, citing to his own deposition (and to the video, which does not show the alleged traffic violation and reveals no overt signs of physical resistance by Ronald during the beating). Def. Resp. to Pl. Facts [130] ¶¶ 3, 21–21. In considering Mandarino's summary judgment motion, Ronald's testimony must be believed. Summary judgment on Ronald's claims of false arrest, false imprisonment, and malicious prosecution is denied.

## B. Stacey Bell's intentional infliction of emotional distress (IIED) claim

The following facts are relevant to Stacey Bell's IIED claim and are viewed in a light most favorable to him. When Mandarino first stopped Ronald in the driveway, his older brother, Stacey, was asleep in the house. Pl. Facts [126] ¶¶ 1, 8–9. The sound of yelling awoke him. *Id.* ¶ 8. Stacey testified that he went downstairs, looked out the window, and heard Mandarino order Ronald to get on the ground. *Id.* ¶¶ 10–11. Ronald kneeled on the ground, put his hands behind

his head, and bowed his head in a defenseless position.[5] *Id.* ¶ 12. Mandarino pulled Ronald down to his hands and knees, then immediately struck Ronald with his baton, even though Ronald gave no apparent physical resistance.[6] *Id.* ¶ 13–14. Mandarino struck Ronald with the baton fifteen times. *Id.* ¶ 15. Stacey did not see all of the baton strikes. Def. Facts [112] ¶ 27. But he saw one blow in which Mandarino swung the baton near Ronald's head and saw Ronald's head jerk in response to the blow.[7] Pl. Facts [126] ¶ 16. During the beating, Stacey came outside and approached Mandarino and Ronald. *Id.* ¶ 17. Stacey stopped when Mandarino pointed the baton at him. *Id.* ¶ 18. Stacey saw his brother lying on the ground, sobbing, and bleeding. *Id.* ¶ 19.

---

[5] Plaintiffs' proposed fact states, "Ronald Bell kneeled on the ground, with his hands behind his head, and his head bowed, in a defenseless position." Pl. Facts [126] ¶ 12. Mandarino denies this fact, citing to the video of the incident for support. The video confirms that Ronald was kneeling with his hands behind his bowed head, so presumably Mandarino objects to the characterization that Ronald was in a defenseless position. All reasonable inferences are taken in Ronald's favor. A reasonable inference may be drawn that Ronald was defenseless in his position.

[6] Plaintiffs' proposed fact states, "Defendant Mandarino then immediately struck Ronald Bell with his baton, without any justification or provocation." Pl. Facts [126] ¶ 14. Mandarino denies this fact, stating Mandarino "struck Ronald Bell as part of effectuating a lawful arrest and traffic stop." Def. Resp. To Pl. Facts [130] ¶ 14. The video provides evidence of plaintiffs' sequence of events and does not depict any signs of physical resistance.

[7] The parties dispute whether Mandarino aimed at Ronald's head and whether the baton actually hit Ronald's head. Def. Resp. to Pl. Facts [130] ¶ 16. Stacey's deposition testimony reveals he assumed the baton hit Ronald's head because he saw Mandarino swing the baton near Ronald's head and saw Ronald's head jerk in response. Pl. Facts, Ex. D, at 61:21–62:20. But the side where the blow would have struck was opposite where he was standing, so he was unable to see where the blow actually landed. *Id.* The video reveals several blows to Ronald's upper body and arms, which were raised to protect his head. It is reasonable to infer in Stacey's favor that the baton hit Ronald on the head, but it is unnecessary to decide whether Mandarino was aiming at Ronald's head.

7

Stacey had trouble sleeping the night of the incident. Def. Facts [112] ¶ 26. Since then he feels he cannot call the Streamwood police or 911 for anything unless he speaks to the deputy chief directly. *Id.* ¶ 26; Pl. Facts [126] ¶ 29. Stacey no longer feels safe or welcome in Streamwood. Pl. Facts [126] ¶ 29. He is trying to move.[8] *Id.* ¶ 30. He has not sought medical or psychological care for emotional distress stemming from what he saw. *Id.* ¶ 25. Stacey testified that he did not seek treatment because he does not believe in going to treatment. Pl. Resp. to Def. Facts [125] ¶ 25; Def. App'x [113], Ex. 11, p. 47 at 117:2-8.

Mandarino argues Stacey cannot establish that he actually suffered severe emotional distress, and therefore his IIED claim fails. To establish IIED, Stacey must show (1) Mandarino's conduct was extreme and outrageous, (2) Mandarino intended to cause severe emotional distress or knew of a high probability that his conduct would cause severe distress, and (3) Stacey actually suffered severe emotional distress because of Mandarino's conduct. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1989). Mandarino denies that the last of these elements has been satisfied, citing to *Woods v. Clay*, No. 01 C 6618, 2005 WL 43239, at *17 (N.D. Ill. Jan. 10, 2005) (Lefkow, J.). In *Woods*, the court concluded at summary judgment that "anxiety and sleepless nights, as well as shame, depression, humiliation, and a damaged sense of security" did not constitute severe emotional distress, especially in the absence of seeking treatment for the distress. Mandarino argues Stacey's complaints of feeling unsafe and difficulty sleeping fail to

---

[8] Mandarino disputes that Stacey is trying to move from Streamwood. Def. Resp. to Pl. Facts [130] ¶ 30. He cites Stacey's deposition testimony that he wants to move but his house is undervalued and he is trying to save enough money to be able to sell it. *Id.*, Ex. B, p. 118:15-21. He has not officially contacted an appraiser or realtor, but relied informally on a friend who is an appraiser and on friends who are realtors. *Id.*, Ex. B, at 118:22–119:11. This testimony does not contradict Stacey's stated desire to move.

rise to the requisite level of severity. Stacey responds that his post-incident fears, coupled with Mandarino's conduct (aggravated by his position of authority as a police officer) are sufficient to withstand summary judgment.

Neither physical injury nor mental health treatment is absolutely necessary under Illinois law to recover for IIED. *Honaker v. Smith*, 256 F.3d 477, 495 (7th Cir. 2001). The severity of Stacey's emotional distress must have been so great that "no reasonable man could be expected to endure it." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 84 (Ill. 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 46). The requirement of severe distress serves to prevent fictitious claims. *Doe v. Calumet City*, 641 N.E.2d 498, 508 (Ill. 1994), *overruled in unrelated part by In re Chicago Flood Litigation*, 680 N.E.2d 265, 273 (Ill. 1997). Illinois law takes the outrageousness of a defendant's actions into account when evaluating the sufficiency of a plaintiff's evidence of severe emotional distress. *Honaker*, 256 F.3d at 496 ("even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. j ("Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed"). In other words, a plaintiff may compensate for weak evidence of severe distress by presenting stronger evidence of the outrageousness of defendant's behavior. *Bristow v. Drake Street Inc.*, 41 F.3d 345, 349–50 (7th Cir. 1994) (noting that Illinois courts tend to merge issues of outrageousness of conduct with issues of the severity of distress). Mandarino's status as a police officer in a position of authority may add to the outrageousness of his actions. *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211–21 (Ill. 1992).

9

Severe long-term effects from the distress are also not a prerequisite for recovery on IIED, if the distress allegedly caused by the defendant's conduct is sufficiently severe. *Fox v. Hayes*, 600 F.3d 819, 842–43, 845–46 (7th Cir. 2010). In *Fox*, the Seventh Circuit applied Illinois law and upheld a jury verdict on an IIED claim in plaintiff's favor even though the only evidence of her distress was that she was terrified and felt her spirit was crushed in the few moments defendant police officer screamed at her. Her husband was being questioned as a suspect in the sexual assault and murder of their three-year-old daughter. The police officer supervising the interrogation became irate at her continued support of her husband and screamed at her. *Id.* at 830. The police officer's position of power over plaintiff, his abuse of that power, and plaintiff's particularly vulnerable state contributed to the conduct's outrageousness and made up for the short duration of plaintiff's distress. *Id.* at 842–43. In fact, the court noted later when reducing damages on the IIED claim that plaintiff presented no evidence linking her lingering emotional problems to the incident with the police officer. *Id.* at 845–46.

Absent the extreme nature of Mandarino's alleged conduct, it is doubtful Stacey's evidence of his distress would be sufficient to survive summary judgment. From Stacey's perspective, which we must accept at summary judgment, he saw a police officer beating his unresisting brother in their driveway and was unable to do anything about it. Stacey's distress *at that moment* could be severe enough for a jury to find Mandarino liable for IIED, as long as Mandarino's conduct was sufficiently extreme and outrageous. Stacey does not describe his emotional state at the moment when Mandarino was beating his brother—the parties instead focus on the aftereffects of the incident. But Stacey describes in great detail what he saw that night. A reasonable jury could conclude that witnessing a police officer commit a seemingly

unprovoked attack on his brother, which left his brother "lying on the ground, sobbing and bleeding," Pl. Facts [126] ¶ 19, could cause Stacey severe distress.

Mandarino's primary authority, *Woods v. Clay*, and the cases it relies on do not involve violent police conduct. In *Woods*, a man was allegedly falsely arrested and unnecessarily tackled during the arrest. His wife did not see the tackle, but she saw her husband on the ground being handcuffed and was then falsely arrested herself and verbally abused. 2005 WL 43239, at *2–5. The tackle and false arrest are not as extreme as the violence Stacey witnessed being inflicted on his brother. Similarly, the cases *Woods*, *id.* at *17, relies on do not allege extreme conduct. *See Farrar v. Bracamondes*, 332 F. Supp. 2d 1126, 1131–32 (N.D. Ill. 2004) (Castillo, J.) (police officers declined to arrest plaintiff's sister for threatening her, laughed at plaintiff, and made inappropriate comments); *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. App. Ct. 1997) (rental car company requested that plaintiff be charged with criminal trespass to vehicles); *Knysak v. Shelter Life Ins. Co.*, 652 N.E.2d 832, 839–40 (Ill. App. Ct. 1995) (health insurance company denied claim for treatment of wife's illness); *Swanson v. Swanson*, 257 N.E.2d 194, 195–96 (Ill. App. Ct. 1970) (plaintiff's brother failed to inform him their mother had died and he missed the funeral). Summary judgment on Stacey's IIED claim is denied.

### III. Plaintiffs Ronald and Stacey Bell's Motion

The Bells move for summary judgment on Count XI, their state law indemnification claim against the village. They argue there is no genuine issue of material fact that Mandarino was acting within the scope of his employment during his encounter with them. The village denies that Mandarino acted within the scope of his employment when he was striking Ronald

with the baton, although it admits the rest of the encounter was within the scope of Mandarino's employment.

These facts are taken in a light most favorable to the village. For purposes of this motion, it is undisputed that at the time of the incident, Mandarino was on duty as a Streamwood police officer, drove a marked squad car, and was in uniform. Pl. Facts [104] ¶¶ 5–6. His duties included conducting traffic stops, arresting offenders, and subduing subjects. *Id.* ¶ 7. While acting within the scope of his employment, he followed a car he believed had committed a traffic violation as it drove to a home and pulled into the driveway, aimed his gun at the two men (Ronald and a passenger) who exited the vehicle, and eventually arrested them. *Id.* ¶¶ 9–11, 13, 29. Before the arrests were completed, Mandarino tasered the passenger and struck Ronald with his baton. *Id.* ¶ 16. The taser and baton were issued to him by the Streamwood Police Department, and he was authorized to use them. *Id.* ¶¶ 18–19. Mandarino is authorized to use force against citizens as detailed by Streamwood's general order on the use of force. *Id.* ¶ 17; Def. Resp. to Pl. Facts [123] ¶ 17.

The village does not dispute that Mandarino acted in the scope of his employment when he first pointed his gun, when he tasered the passenger, when he removed his baton from his belt, when he expanded his baton, when he pulled Ronald's hands to the ground, when he handcuffed Ronald, when he placed Ronald in a squad car, and when he drove Ronald to the police station. Pl. Facts [104] ¶ 30–31. The village disputes only that the baton strikes were within the scope of employment. *Id.* ¶ 30. The Bells rely on Mandarino's stated purpose for striking Ronald.[9]

---

[9] Curiously, as evidence of Mandarino's stated purpose for his actions, the Bells rely on the same requests to admit at issue in Mandarino's motion, even though those admissions are binding only on Mandarino, not on the village. 8B WRIGHT, MILLER & MARCUS, FEDERAL

12

According to Mandarino, he struck Ronald in part to subdue him and to effectuate what he believed was a lawful arrest. Pl. Facts [104] ¶¶ 23–24. The village focuses on the Streamwood police chief's opinion that the baton strikes were totally unnecessary to conduct the arrest because Ronald was submissive to Mandarino and his hands were in a position where he could have been handcuffed and the arrest completed without needing to use the baton. Def. Facts [123] ¶ 2. The village further notes that as Mandarino approached the men in the driveway, they were verbally abusive. The passenger said to him, "Fuck you." *Id.* ¶ 4. Ronald told him, "Fuck you. This is bull shit. Why are you stopping me?" and asked him, "What is your fucking problem?" *Id.* ¶ 5.

Illinois law requires a public entity such as the Village of Streamwood to pay any tort judgement directed against an employee whose tortious acts were done within the scope of his employment. 745 ILCS 10/9-102. In defining the scope of employment, Illinois relies on the Restatement (Second) of Agency. *Adames v. Sheahan*, 909 N.E.2d 742, 755 (Ill. 2009). Mandarino's conduct in striking Ronald is within the scope of his employment only if:

    (a) it is of the kind he is employed to perform;

    (b) it occurs substantially within the authorized time and space limits;

    (c) it is actuated, at least in part, by a purpose to serve his employer, and

    (d) if force is intentionally used by the employee against another, the use of force is not unexpectable by the employer.

---

PRACTICE AND PROCEDURE § 2264 (admission of a party does not bind a coparty). Regardless, the village admits the proposed fact and relies instead on possible unstated purposes Mandarino might have had.

RESTATEMENT (SECOND) OF AGENCY § 228(1). The Bells bear the burden of establishing each factor. *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007). For Mandarino's actions to fall outside the scope of employment, they must be "different from the type of acts he is authorized to perform or were performed purely in his own interest." *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996); RESTATEMENT (SECOND) OF AGENCY § 228(2).

There is no genuine dispute that the first two of the four scope-of-employment factors are present. Mandarino's use of force to effectuate an arrest, even if carried out improperly, is among the duties he is employed to perform as a police officer. The baton strikes occurred while Mandarino was on duty and within the village boundaries. Therefore the acts occurred within authorized time and space limits.

The Bells contend the fourth factor is also easily satisfied; Mandarino was authorized to use force under some circumstances, and the village supplied him with a taser and baton for patrols. Therefore, his use of force was not unexpectable. The village concedes police departments might expect some excessive force. But it argues Mandarino's conduct—striking Ronald fifteen times with a baton while he was kneeling with his hands in the air—was so outrageous and excessive that it was unexpectable. However, § 228 does not ask whether the particular manner in which force was used was expectable. It asks whether "the use of force" is expectable. RESTATEMENT (SECOND) OF AGENCY §§ 228(1)(d), 245. As a matter of law, it cannot be a surprise that Mandarino while on duty might use force on the subject of an arrest. Mandarino had a duty to arrest offenders, was authorized to use force if necessary during the arrest, and was provided with a taser and a baton. The Restatement (Second) of Agency specifies that if an employee is authorized to use force and acts intending to serve his employer, the

14

employer is still liable for the employee's actions even if the employee makes a negligent mistake of fact that he is privileged to act or "in an excess of zeal uses more than necessary force." RESTATEMENT (SECOND) OF AGENCY § 245 cmt. e. The asserted outrageousness of Mandarino's conduct may evidence a purely personal motive for his actions, but it does not affect whether the village should expect that its officers may use force when making an arrest.

The remaining factor—Mandarino's purpose in striking Ronald—is contested. Section 228 requires that Mandarino be motivated at least in part to serve the village in order for his acts to be in the scope of employment. Dual purposes are permissible; an intention to vent personal anger or get revenge against Ronald does not remove the acts from the scope of employment if Mandarino also intended to further the village's interest in making an arrest. RESTATEMENT (SECOND) OF AGENCY §§ 236, 245 cmt. f; *Pyne v. Witmer*, 543 N.E.2d 1304, 1309 (Ill. 1989); *Randi F. v. High Ridge YMCA*, 524 N.E.2d 966, 970 (Ill. App. Ct. 1988). Only if Mandarino acted "purely in his own interest" will this factor preclude liability against the village. *Wright*, 675 N.E.2d at 405; *Randi F.*, 524 N.E.2d at 970; RESTATEMENT (SECOND) OF AGENCY § 235. In determining Mandarino's intent, his state of mind is material. RESTATEMENT (SECOND) OF AGENCY § 235 cmt. a. But external manifestations may serve as evidence about his intentions. *Id.* Thus, outrageous actions or excessive force may be evidence that Mandarino's actions were purely personal. *Id.* §§ 235 cmt. c ("The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm" (citations omitted)); 245 cmt. f.

15

The facts here are undisputed; the village is relying on inferences from those facts. If Mandarino's stated purposes actuated him "to any appreciable extent," Streamwood is liable. RESTATEMENT (SECOND) OF AGENCY § 236 cmt. b. To that end, the village contends Mandarino's stated purposes are a lie and played no part in driving his actions. The village urges this court to infer that Ronald and his passenger's vulgar language provoked Mandarino to gratuitously strike Ronald fifteen times as a frolic with no thought to effectuating the arrest.

The Bells contend this case is indistinguishable from *Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997). In *Wilson*, plaintiff alleged Chicago police officers tortured him to force a confession that he murdered two Chicago police officers. *Wilson v. City of Chicago*, 900 F. Supp. 1015, 1019 (N.D. Ill. 1995) (Gettleman, J.). Plaintiff sued after his conviction for the murders was overturned. He moved for summary judgment on his indemnification claim against the city, contending the officers acted in the scope of their employment while torturing him. *Id.* at 1029. The district court determined as a matter of law that the officers acted within the scope of employment, because "the purpose of the Officer's beating of plaintiff, although improper, was incidental to their official duties and fulfilled their employer's objectives." *Id.* at 1030. The city argued that the beating was outside the scope of employment because of the extreme nature of the conduct, because the officers acted outrageously, and because their actions were criminal. *Id.* at 1030–31. The district court rejected each argument, concluding the officers acted at least in part to obtain a confession for the city and did so while on duty at the police station. *Id.* at 1031. "[E]ven if they were motivated by revenge, [they] were also motivated by their desire to fulfill the City's objectives—to make an arrest and elicit a confession from plaintiff." *Id.* at 1032. The Seventh Circuit affirmed the district court's scope of employment

16

decision, stating that an argument the officers did not act within the scope of employment "borders on the frivolous." *Wilson*, 120 F.3d at 685.

Taking all reasonable inferences in the village's favor, the torture in *Wilson* was more directly connected to the police department's purposes (solving two murders) than the beating here, leaving open the possibility that purely personal factors drove Mandarino. *Cf. Jude v. City of Milwaukee*, No. 06 C 1101, 2010 WL 2643383, at *4–5 (E.D. Wisc. June 30, 2010) (Adelman, J.) (concluding under Wisconsin law that a reasonable jury could conclude that police officer acted outside the scope of his employment during an arrest for the brief moment that he stomped on plaintiff's head). The officers in *Wilson* needed a confession so that they could make an arrest in the open homicides of two police officers, whereas Mandarino did not have an open case to solve. No evidence was presented in *Wilson* that the plaintiff did anything that would provoke a personal reaction from the police officers. *Cf. Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1093–96 (7th Cir. 1990) (deciding under Wisconsin law that officer who shot a handcuffed, prone, unresisting arrestee point blank in the back of the head was acting in the scope of employment because there was no evidence of a private connection between them or that officer was cruising the streets, instigating fights, leaving as only possible purpose an intent to serve the employer in effectuating the arrest, albeit done improperly). Here, the Bells and the village concede (although disputed by Mandarino) that Mandarino could have completed the arrest without striking Ronald; his hands were in a position where they could be safely handcuffed. Therefore, the link to a police purpose—effectuating a safe arrest—is more attenuated, leaving room for the possibility of a different dominating purpose. Given the importance allotted to Mandarino's stated purpose, it questionable to infer from the village's

17

evidence that Mandarino's *only* purpose in repeatedly striking Ronald was to get revenge for Ronald's backtalk. This question must be resolved by a jury. Summary judgment on the Bell's indemnification claim against the village is denied.

## IV. Defendant Village of Streamwood's Motion

The village moves for summary judgment on the *Monell* claim in Count I. Count I alleges Mandarino used excessive force on Ronald and the village contributed to the injury by failing to adequately train its officers in the use of force. The facts are viewed in a light most favorable to Ronald.

The main dispute is whether all Streamwood police officers receive baton training as part of basic training at a police academy. *See* Pl. Resp. to Def. Facts [118] ¶ 15. Streamwood's Chief of Police, Alan Popp, testified that basic training at a police academy includes baton training and that once he personally witnessed part of a baton training session at the Suburban Law Enforcement Academy. Def. Facts [110], Ex. A, pp. 25, 68; Pl. Facts [119] ¶ 29. The participants in that training session did not appear to be taking the training seriously. Pl. Facts [119] ¶ 29. Mandarino testified that he received baton training at the Police Training Institute. Def. Facts [110], Ex. C, p. 14. This evidence is sufficient to establish that all Streamwood police officers are trained in baton use. The chief of police would certainly know what elements are included in police training conducted at police academies certified by the state. *See* 50 ILCS 705/1 *et seq.* It is true, as Ronald points out, Chief Popp did not discuss what the police academy baton training specifically entails and was unimpressed with the one session he saw. But this does not change the fact that some training occurs. Even though all reasonable inferences are drawn in Ronald's favor, he offers no evidence to contradict Chief Popp's testimony that he has